Richard McDUFFEE, Peter Goeddertz, Bill Berntsen, Adrian Heath, James Jenkins, Thomas Curry, Benjamin Allison and Robert Allison, Appellants,

v.

Gene MILLER, Bill Neill and Winton Davenport, Appellees.

No. 09–10–00293–CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 22, 2010.

Decided Oct. 28, 2010.

Eric Yollick, C. Travis Owens, Yollick Law Firm, P.C., The Woodlands, TX, for appellants.

James H. Stilwell, Martin, Stilwell & Jones, LLP, The Woodlands, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

This election contest presents an appeal by eight of the ten voters whose ballots were disallowed in the May 8, 2010, election for directors of The Woodlands Road Utility District No. 1 ("RUD"). The appellants contend that prior to the election, the voters casting the ten disallowed votes moved from their prior residences within Montgomery County to 9333 Six Pines Drive, a Marriott Residence Inn, and established residence there. Following the trial of the election contest, the trial court found that ten of the votes were *"not valid."* We conclude that the trial court was presented with a fact issue concerning whether the voters casting the ten disallowed votes had established residence in the RUD, and that clear and convincing evidence supports the trial court's ruling that they had not done so. Accordingly, we affirm the judgment.

### Background

The RUD is composed almost exclusively of commercial properties in The Woodlands. The unofficial results of the May 8, 2010, RUD election showed that Gene Miller, Bill Neill, and Winton Davenport—the three incumbent directors on the ballot—had been defeated in a vote of ten to two by candidates Richard McDuffee, Peter Goeddertz, and Bill Berntsen. Miller, Neill, and Davenport filed an election contest and sued the RUD to enjoin it from counting ten "illegitimate" votes. Their petition asserts that the votes were "illegitimate" because ten voters casting votes for McDuffee, Goeddertz, and Berntsen were not residents of the RUD. The incumbents' suit challenges the votes cast by McDuffee, Goeddertz, Berntsen, Adrian Heath, James Jenkins, Thomas Curry, Benjamin Allison, Robert Allison, Sybil Doyle, and Roberta Cook.

As of April 2010, each of the challenged voters had executed a voter registration form giving an address of 9333 Six Pines Drive as the location of their respective residences. The appellants' brief indicates that this is the location of The Residence Inn, a residential hotel.

Shortly after the incumbents filed suit, the ten voters whose votes were challenged intervened. The intervenors requested the trial court to enjoin the incumbent directors from interfering with the RUD's canvass and from interfering with the certification of the election. On the first day of the trial, which commenced on June 7, 2010, the parties agreed to try the case as an election contest.

Following the trial, the trial court determined that the votes cast by McDuffee, Goeddertz, Berntsen, Heath, Jenkins, Curry, Benjamin Allison, Robert Allison, Doyle, and Cook were, "by clear and convincing evidence, *not valid."* The trial court further found that the votes cast by Kate Laukien and Dirk Laukien were, "by clear and convincing evidence[,] *valid."* Then, the trial court ordered the RUD to canvass the two valid ballots and to certify the election of Miller, Neill, and Davenport as RUD's newly elected directors. Subsequently, eight of the ten intervenors, McDuffee, Goeddertz, Berntsen, Heath, Jenkins, Curry, Benjamin Allison, and Robert Allison, perfected an appeal.[1]

1. In this opinion, we refer to Miller, Neill, and Davenport as appellees, incumbents, or as "incumbent directors." We collectively refer to the ten votes that the trial court deter-

In eight issues, the appellants advance three theories to overturn the trial court's judgment. Issues one through seven argue that the trial court erred by finding the challenged votes *"not valid."* The appellants advance two arguments that assert the trial court did not have subject matter jurisdiction over the parties' dispute. In issue one, the appellants argue that the trial court had no jurisdiction over the dispute because the voter registrar has exclusive authority concerning the registration of voters. In issue eight, the appellants argue that the trial court lacked subject matter jurisdiction over the dispute. We address the appellants' two jurisdictional arguments first.

## Jurisdiction

### Pleadings

■■■ A trial court is required to have subject matter jurisdiction to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). Because district courts have a broad grant of jurisdiction to resolve disputes, a constitutional presumption exists that "district courts are authorized to resolve disputes." *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex.2004); *see also* Tex. Const. art. V, § 8. The question of whether a trial court has subject matter jurisdiction is a question of law, and the issue is reviewed de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998).

■■■ By statute, district courts have exclusive original jurisdiction over election contests. Tex. Elec.Code Ann. § 221.002(a) (West 2010). In determining whether a party's pleading has invoked a trial court's jurisdiction, we broadly construe the pleadings in the plaintiff's favor. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002). From the incumbents' pleadings, it is clear that their dispute centers on whether the voters casting challenged votes had cast legal votes in the election of RUD's directors. It further appears that the challenged voters joined issue on the question of whether they were residents of the RUD, as they allege in their amended intervention that they met the residency requirements of the Election Code. Further, no party claimed surprise when, on the morning of trial, both parties agreed to try the case as an election contest. *See* Tex.R. Civ. P. 67.

In issue eight, the appellants argue that the incumbents' written pleadings are insufficient to invoke an election code contest. The incumbents' written pleadings assert a claim that ten "illegitimate" votes had been cast for Berntsen, Goeddertz, and McDuffee. The incumbents then sought to prevent these "illegitimate" votes from being counted. When broadly construed, the incumbents pleadings placed in issue the question of which votes should be counted. Relying on Rules 66[2] and 67[3] of the Texas Rules of Civil Procedure, the appellants argue that the incumbents were required to file amended written pleadings to conform their written pleading to their oral trial amendment in-

---

mined as not eligible to be counted (McDuffee, Goeddertz, Berntsen, Heath, Jenkins, Curry, B. Allison, R. Allison, Doyle, and Cook) as the "challenged votes." We use the term "appellants" to refer to McDuffee, Goeddertz, Berntsen, Heath, Jenkins, Curry, B. Allison, R. Allison, the eight voters who perfected their right to appeal from the trial court's judgment. The term "candidates" refers collectively to McDuffee, Goeddertz, and Berntsen, who challenged the incumbent directors in the May 2010 election.

2. Rule 66 concerns a party's trial amendment of its pleadings. *See* Tex.R. Civ. P. 66.

3. Rule 67 concerns the trial of issues that the parties have tried by implied or express consent. *See* Tex.R. Civ. P. 67.

voking Chapters 231 and 232 of the Election Code. We disagree that the incumbents' written pleadings are insufficient to invoke the trial court's subject matter jurisdiction over an election dispute. *See* Tex. Elec.Code Ann. § 221.002(a); *County of Cameron,* 80 S.W.3d at 555.

■ Because we have determined that the incumbents' written pleadings were sufficient to invoke the trial court's jurisdiction over the dispute, we need not rely on the incumbents' oral trial amendment to resolve issue eight. Moreover, even if we were to find the incumbents' pleadings deficient, we observe that Rule 67 provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Tex.R. Civ. P. 67. Here, both parties consented on the morning of the first day of trial to the trial of the case as an election contest, and the trial court then allowed both parties to make oral trial amendments to their pleadings, which their respective attorneys dictated into the record. None of the parties objected to this procedure. *See City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 73 (Tex.2000) (defendant waived its claim of error by failing to object to plaintiff's failure to file amended pleadings to conform his pleadings to his request for trial amendment that the trial court had granted during trial); *Gulf & Basco Co. v. Buchanan,* 707 S.W.2d 655, 657 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Whitley v. Whitley,* 566 S.W.2d 660, 662 (Tex.Civ.App.-Beaumont 1978, no writ).

In summary, the trial court had subject matter jurisdiction over the dispute. As a result, the trial court had the power required to resolve the parties' dispute. Issue eight is overruled.

*Registrar's Jurisdiction*

■ In issue one, the appellants argue that the trial court lacked subject matter jurisdiction over the dispute because the incumbents did not first challenge the registrations of the voters casting the challenged votes in a hearing before the registrar. *See* Tex. Elec.Code Ann. § 16.091 (West 2010). Resolving this issue requires that we examine the role the Legislature intended the trial court to play in resolving an election contest.

Under the Election Code, the scope of the trial court's inquiry into an election contest includes "whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because ... illegal votes were counted[.]" Tex. Elec.Code Ann. § 221.003 (West 2010). An "illegal vote" is defined as "a vote that is not legally countable." *Id.* Clearly, the Legislature contemplated the use of election contest proceedings to resolve disputes concerning whether votes were countable. To address appellants' argument that the incumbents' failure to pursue a hearing with the registrar deprived the trial court of its jurisdiction over the dispute, we must determine if the " 'Constitution or other law' conveys exclusive, appellate, or original jurisdiction on another court or administrative agency." *In re Entergy,* 142 S.W.3d at 322. Section 16.091 of the Election Code states that "[e]xcept as otherwise provided by this subchapter, a registered voter may challenge the registration of another voter of the same county at a hearing before the registrar." Tex. Elec.Code Ann. § 16.091. The subchapter provides "[t]he hearing procedure does not apply to an allegation of a ground based on residence." Tex. Elec.Code Ann. § 16.093 (West 2010); *see also* Tex. Elec.Code Ann. § 16.0921 (West 2010) ("Confirmation Notice on Challenge Based on Residence."). While Chapter 16

of the Election Code contains provisions allowing certain voters to challenge another's voter registration on the issue of the voter's residence, we find nothing in the Election Code to indicate the Legislature intended to create a pervasive regulatory scheme making challenges through the voter registrar the sole remedy to ensure the integrity of elections. *See In re Entergy*, 142 S.W.3d at 322.

Generally, a person must reside in the territory covered by the election to be eligible to vote. Tex. Elec.Code Ann. § 11.001(a)(2) (West 2010). Except where otherwise provided in the Election Code, "a person may vote only in the election precinct in which the person resides." Tex. Elec.Code Ann. § 11.003 (West 2010). A vote by a person who does not reside in the district covered by the election "is legally uncountable." *Gonzalez v. Villarreal*, 251 S.W.3d 763, 777 (Tex.App.-Corpus Christi 2008, pet. dism'd w.o.j.). One statutory exception that deems a vote by a person registered in the wrong precinct to be valid does not apply if "the voter intentionally gave false information to procure the erroneous registration." Tex. Elec. Code Ann. § 11.005 (West 2010). Thus, based upon the Election Code, a vote is not valid and is not legally countable if the voter intentionally gave false information about the voter's residence to procure the registration.

The Legislature gave district courts a significant role in election contest proceedings. In an election contest, the district court determines whether the canvassed result includes illegal votes. Tex. Elec. Code Ann. § 221.003. The trial court is expressly authorized to subtract illegal votes from the official total for the candidate. Tex. Elec.Code Ann. § 221.011 (West 2010). Thus, it does not appear that the Legislature intended the registrar's role of hearing complaints about the validi-

ty of a voter's registration to be the exclusive method of assuring the accuracy of elections.

The appellants rely on *Pryor v. Dolgener* to support their argument that the incumbents were required to pursue a hearing with the registrar. *Pryor v. Dolgener*, 324 S.W.3d 178 (Tex.App.-El Paso 2010, pet. dism'd w.o.j.). But in *Pryor*, the issue the court addressed concerned deficiencies in the voter registration process. The *Pryor* court did not address the question of whether challenges through the registrar were the exclusive means to lodge a challenge based on a voter's residence or the voter's citizenship. *Id.* at 180. Moreover, *Pryor* does not support the appellants' claim that a failure to challenge a voter's registration through the registrar deprives the trial court of jurisdiction over the case. In *Pryor*, the Court of Appeals affirmed the trial court's judgment to count the votes. *Id.* at 180. The appeals court did not dismiss the case for lack of jurisdiction or hold that the complaints had been waived. *Id.*

Having determined that the Legislature did not intend Chapter 11 of the Election Code to be exclusive, we hold that the district court had jurisdiction over the parties' dispute. We overrule issue one to the extent it challenges the trial court's subject matter jurisdiction over the dispute.

### Standard of Review

In issues one through seven, the appellants challenge whether clear and convincing evidence supports the trial court's determination that the challenged votes were invalid. In support of their argument that the incumbents failed to carry their burden of proof, the appellants contend that the incumbents failed to prove that voters casting the contested votes were not residents of the RUD as they had claimed in their filings with the voter registrar. The

incumbent directors acknowledge that they bore the burden of proving their case by clear and convincing evidence.

We review the trial court's judgment in an election contest for abuse of discretion. *McCurry v. Lewis*, 259 S.W.3d 369, 372 (Tex.App.-Amarillo 2008, no pet.). An abuse of discretion occurs when the trial court acts "without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985); *McCurry*, 259 S.W.3d at 372. If the trial court acted within its discretion, we cannot reverse the judgment simply because we might have reached a different result. *See Downer*, 701 S.W.2d at 242.

In conducting a legal sufficiency review under a clear and convincing standard, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex.2002). We disregard "all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* at 266. But, in reviewing legal sufficiency of the evidence under a clear and convincing standard, we cannot disregard contrary evidence that the trier of fact could not ignore. *City of Keller v. Wilson*, 168 S.W.3d 802, 817, 830 (Tex.2005). When the trial court has acted as fact-finder, the trial court determines the credibility of the witnesses and the weight to be given their testimony. *Woods v. Woods*, 193 S.W.3d 720, 726 (Tex. App.-Beaumont 2006, pet. denied); *see also City of Keller*, 168 S.W.3d at 819. In resolving factual disputes, the trial court may believe one witness and disbelieve others, and it may resolve any inconsistencies in a witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). In making credibility determina-

tions, the trier-of-fact "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820. Therefore, the trier-of-fact is not "free to believe testimony that is conclusively negated by undisputed facts." *Id.* However, if the trier-of-fact could reasonably believe the testimony of one witness or disbelieve the testimony of another witness, the appellate court "cannot impose [its] own opinions to the contrary." *Id.* at 819.

### Sufficiency of Evidence

In issues one through seven, the appellants argue that the trial court's determinations regarding the challenged voter's residences were not based on clear and convincing evidence. Because the appellees prevailed in the trial court, we look at all the evidence in the light most favorable to the judgment and determine if the trier-of-fact could reasonably have formed a firm belief or conviction that the residences of the ten voters casting the challenged votes "were not within the RUD on the date each of them signed a voter's registration application, nor on May 8, 2010, when they voted, nor subsequently." *See In re J.F.C.*, 96 S.W.3d at 265–66.

The parties dispute whether the voters casting the challenged votes resided within the RUD during the relevant periods required by the Election Code. The RUD's election was on May 8, 2010. The business records of the Residence Inn established that during 2010, Jenkins checked into the hotel on May 7 and checked out on May 9; Curry checked into the hotel on April 30 and checked out on May 1, then checked in again on May 7 and checked out on May 8; and Benjamin Allison checked into the hotel on May 14 and checked out May 15. The notes on Jenkins' record states that

Heath, Curry, Goeddertz, and McDuffee were also in Jenkins' room. Jenkins' bill provides an address that appears to be a business address in Spring. Curry's hotel bills list an address in Get, Texas. Benjamin Allison's bill provides an address that we will refer to as D Street in Conroe. Other evidence admitted at trial shows that this is his parents' address, and that Benjamin and his brother, Robert, lived there prior to the date of the election. None of the voters casting challenged votes were checked into the Residence Inn from January 1, 2010, through May 19, 2010, except for the short period surrounding the date of the election. At trial, the voters who had cast the challenged votes produced additional receipts that showed that Benjamin Allison checked into the Residence Inn on May 26, 2010, and checked out on May 28, 2010; Goeddertz, Jenkins, Heath, and Curry checked into a single room on May 26, 2010, and checked out on May 27, 2010; Curry checked in on May 20 and checked out on May 21, 2010; and Jenkins had a reservation for a room at the Residence Inn for 14 nights commencing May 30, 2010.

Each of the voters casting challenged votes had filled out a voter registration form representing the respective applicant's residence as being located at the Residence Inn. Each of the appellants was physically present at the Residence Inn at some time on the day of the election. Each appellant also testified to having resided at the Residence Inn on May 7 or May 8, 2010. Nonetheless, documents in evidence allowed the trial court to infer that the intent of each voter casting a challenged vote was to stay at the Residence Inn temporarily, and not to establish residence there despite each voter's testimony to the contrary.

The following are some of the facts established by the record relevant to the issue of the contested voters' residences. McDuffee signed a voter registration application on April 5, 2010. McDuffee also filed an application for a place on the May 8, 2010, RUD election ballot. A prior voter application, which McDuffee signed on March 3, 2010, states that his permanent residence address is in Spring on a street we will refer to as H Street. This address does not lie within the RUD. In February 2009, McDuffee signed an application for a residential homestead exemption for the H Street property. The H Street address is listed as McDuffee's mailing address on his April 2010 voter registration application and as McDuffee's residential address on his December 2008 voter registration application.

McDuffee admitted that he did not live at the Residence Inn on April 5, 2010, when he signed the voter registration application. In May, McDuffee did not register at the hotel, but stayed with Curry, who was registered. McDuffee admitted he never lived at the Residence Inn until May 7, 2010, the date that Curry checked into the hotel. According to McDuffee, "[i]t was basically a party. There were people coming and going all night, so I saw Mr. Jim Jenkins, Tom Curry, Bill Berntsen, Adrian Heath, Ben and Robert [Allison]." McDuffee testified that Jenkins, Goeddertz, and Berntsen also stayed in the room where McDuffee spent the night. McDuffee arrived at the Residence Inn after a trip he took to Grimes County, and he brought a suitcase containing one or two changes of clothes and his shaving kit. Before his weekend trip to Grimes County, McDuffee testified that he had been living with his wife, children, and pets on H Street.

As of the date of the trial, McDuffee had not changed his driver's license to reflect his change in address to the Residence Inn. McDuffee did not change his address

to the Residence Inn on his federal income tax return, filed in April 2010 before the RUD election. According to McDuffee, he was "in the transition period" on election day and at the time of trial most of his possessions were either at the Residence Inn or at his Grimes County residence. As of the date of the trial, McDuffee acknowledged that his family resided on H Street, and McDuffee testified that he spent the night at H Street most nights in May. McDuffee, Goeddertz, and Jenkins were also present at the Residence Inn on Memorial Day. McDuffee testified that he eats breakfast at the Residence Inn three or four days a week, and he identified undated photographs depicting several of the challenged voters engaged in activities at the Residence Inn.

Evidence similar to that concerning McDuffee is in the record regarding the other voters who cast contested votes. Berntsen signed a voter registration application on April 1, 2010. Berntsen also filed an application for a place on the May 8, 2010 RUD election ballot. A prior voter application, which Berntsen signed on March 3, 2010, states that Berntsen's permanent residence address is in The Woodlands at an address we will refer to as R Street. This address does not lie within the RUD. Berntsen has maintained a homestead exemption on this property since 1995. The R Street address is identified as Berntsen's mailing address on his April 1, 2010 voter registration application. Berntsen represented that he resided at R Street on April 28, 2010, when he voted early in The Woodlands Township election. Berntsen also voted in a MUD election on May 8, 2010, although the Residence Inn is not located in the MUD's district. Berntsen testified that he was given a ballot for the MUD election.

Berntsen admitted that May 7 was the first date in 2010 he stayed at the Resi-

dence Inn. He did not pay for a room, but stayed in someone else's room for that one night. Berntsen claimed he started staying at the hotel after the lawsuit was filed. Berntsen testified that he intended to reside at the Residence Inn on the date of the election at the time he changed his voter registration. Berntsen said he was in the process of moving from R Street to another house he owns in Grogan's Mill. Grogan's Mill is also not in the RUD. Berntsen testified that he decided to reside in the RUD on election day so that he could help his friends take over the RUD. As of the date of trial, Berntsen's driver's license, his car registration, and his tax return all reflect that he resides on R Street.

Goeddertz's March 31, 2010, voter registration application represents that his mailing address is on a street we refer to as W Street in Magnolia. Goeddertz also filed an application for a place on the May 8, 2010, RUD election ballot. The application for a place on the May 2010 general election ballot, which Goeddertz signed on March 4, 2010, represents that W Street is Goeddertz's permanent residence address. This address does not lie within the RUD. Goeddertz has owned the W Street property since 1976 and has had a residential homestead exemption on it since 1982. W Street is also the address Goeddertz listed as his residence on his prior voter registration application. Goeddertz admitted that he had lived on W Street for thirty-three years, and that his driver's license bears that address.

Goeddertz testified that he decided to select the Residence Inn as his residence so that he could vote in the RUD election. According to Goeddertz, the challenged voters made that decision as a group for political reasons. He obtained a post office box to reflect his residence at the Residence Inn. Goeddertz testified that

since the election, he has stayed either at the Residence Inn or at an address in Manvel where his ex-wife lives. Goeddertz claimed to have spent a dozen nights at the Residence Inn since May 7, 2010. Although the Residence Inn is not in the MUD, Goeddertz also voted in the MUD election. Goeddertz attributed the MUD vote to a mistake by the elections' clerk.

Heath filed a voter registration application dated March 5, 2010. Heath provided a post office box for his mailing address on the voter registration application. Heath has maintained a residential homestead exemption for a home on a street we refer to as S Street in The Woodlands since 1991. S Street is not in the RUD. S Street is the residence address on Heath's prior voter registration application.

Heath testified that when he signed the voter registration card on March 5, 2010, he did not live at the Residence Inn. On March 18, 2010, Heath changed his driver's license to reflect that his address was located at the Residence Inn. Heath and his wife lived at the S Street address until May 7, 2010. Heath stayed in Jenkins's room the nights of May 7 and May 8, 2010. When he went to the Residence Inn, Heath brought clothes to stay about two nights, a book, and some toiletries. On May 8, Heath voted in the RUD election and then voted in a township election at different polling places. He did not return to the hotel until after the lawsuit was filed. During the periods relevant to the election, Heath's wife and family remained at the house on S Street.

Heath testified that on March 5, 2010, he decided to move his residence. Heath explained that he wanted to sell his house to get out of debt. Heath testified that the Residence Inn is a place where he and his wife can stay after their children leave home and their house sells. Heath's wife was not with him when he stayed at the Residence Inn.

Jenkins signed a voter application form on April 5, 2010. The form states that Jenkins mailing address is on a street we refer to as P Street in The Woodlands. Jenkins has maintained a residential homestead exemption at the P Street address since 1993, and he was living there in March 2010. P Street is the residence address identified on the voter registration form replaced by the form Jenkins signed on April 5, 2010. The P Street address is not in the RUD. Jenkins testified that he stayed at the Residence Inn for the first time on May 7, 2010. Jenkins stayed at the Residence Inn the night of May 8, 2010, and was there the following day. Jenkins's family lives at the P Street address and much of his personal property was there after the election. Jenkins put his house on the market after the election, but his furniture and belongings were still there on the date of trial. Jenkins testified that he stayed at the Residence Inn on May 7, May 15, and June 7, 2010. On May 22, 2010, Jenkins changed his driver's license to reflect that he resided at the Residence Inn.

Jenkins explained that he eats breakfast at the Residence Inn almost every morning. According to Jenkins, he saw all of the voters whose votes were challenged by the incumbents at the Residence Inn on Memorial Day, and Jenkins sees every one of them there almost every day. Jenkins produced undated photographs depicting some of the voters whose votes were challenged at the Residence Inn. According to Jenkins, McDuffee stayed at the Residence Inn three times in June 2010, and Berntsen stayed at the Residence Inn twice in May and at least twice in June 2010.

Curry signed a voter registration application on April 1, 2010. The mailing ad-

dress listed on the form is a post office box. Since 2004, Curry maintained a residential homestead exemption at an address we will refer to as A Street in Conroe. That same address is the residence address on Curry's prior voter registration application. It is not in the RUD. Curry also voted in the MUD election. Curry testified that he had no idea where the MUD boundaries were, and he stated that he had relied upon others to tell him whether he could vote in the MUD election.

Curry admitted that he did not stay at the Residence Inn on any day in 2010 before April 30, 2010. Curry stayed there for one night on April 30 and again for one night on May 7. Curry did not spend another night at the hotel until after the lawsuit was filed. On May 22, 2010, Curry changed his driver's license to reflect a Residence Inn address. His checking account also shows the hotel's address. On May 7, Curry brought two or three sets of jeans, toiletry items, his planner, and his checkbook to the Residence Inn. Curry's wife did not accompany him to the Residence Inn. After the election, Curry and his wife spent a dozen nights or more at the Residence Inn.

Sybil Doyle's April 1, 2010, voter registration application provides a mailing address that we refer to as B Street in Conroe. B Street is the residence address for her prior voter registration. Doyle filed a residential homestead exemption for the B Street address on February 22, 2010. The B Street address is not in the RUD. Doyle did not stay overnight at the Residence Inn on election night.

Roberta Cook signed a voter registration application on April 7, 2010. On the form, Cook represented that her mailing address is an address we refer to as C Street. Cook has maintained a residential homestead exemption at the C Street ad-

dress since 2006. C Street is also the residence address listed on her prior voter registration. C Street is not in the RUD. Cook did not spend the night at the Residence Inn on election night.

Benjamin Allison signed a voter registration form on April 6, 2010. Benjamin stated that his mailing address is on a street we refer to as D Street in Conroe. D Street is the address on Benjamin's 2005 voter registration application. Benjamin's parents applied for a homestead exemption on the property at the D Street address in 2003, and the residence at that address is not in the RUD.

Benjamin Allison testified that he had been living in his parents' home on D Street before the election, and that he stayed in Curry's room at the Residence Inn on the night of May 7 and then voted the next day. Benjamin indicated that he had not stayed at the Residence Inn prior to May 7. When he came to the Inn, Benjamin brought a change or two of clothing, some toiletries, and his computer. Benjamin also stayed at the hotel on the night of May 8. He did not return to the hotel again until after the lawsuit was filed. After the suit was filed, Benjamin changed his driver's license to indicate the Residence Inn as his address. Benjamin explained that he moved because "this seemed to be a good opportunity to not only have a direct involvement in an election that I could influence, but it also got me closer to work." Benjamin testified that when he signed his current voter registration card he had formed an intent to move his residence to the hotel. Since the date of the election, Benjamin testified that he had spent seven to twelve days at the D Street address and at least twenty days at the Residence Inn.

Robert Allison testified that on the day he filed the voter registration form representing that his residence was at the Resi-

dence Inn, he lived with his parents, as did his brother, Benjamin. According to Robert, the first day he stayed at the Residence Inn was May 7, when he stayed in Curry's room. While staying there, he had a bag with clothing and toiletries. Robert stayed at the Residence Inn only for the night of May 7, 2010. He did not stay there on any of the four nights following the election. Robert testified that he moved into the Residence Inn with his brother so he could live closer to where he worked and to have more space. He understood that the voter registration form he signed on April 6, 2010, did not take effect for thirty days. Robert testified at the trial that that he still received his mail at his parents' house.

While the evidence as to each of the contested voter's residences differ in some respects, our resolution of the appeal turns on the meaning of the term "residence." The Election Code defines the term "residence." Tex. Elec.Code Ann. § 1.015(a) (West 2010). "Residence" "means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence." *Id.* Factors considered in determining residence include volition, intention, and action. *Speights v. Willis,* 88 S.W.3d 817, 819 (Tex.App.-Beaumont 2002, no pet.). When a person's statements regarding residence are inconsistent with the facts showing actual residence, "such statements 'are of slight weight' and cannot establish residence in fact." *In re Graham,* 251 S.W.3d 844, 850 (Tex.App.-Austin 2008, no pet.) (quoting *Texas v. Florida,* 306 U.S. 398, 425, 59 S.Ct. 563, 83 L.Ed. 817 (1939)).

A designation of a homestead outside the voter's district may be relevant to a trial court's resolution of a dispute concerning a voter's residence. As of the date of the RUD election, eight of the ten challenged voters had designated homesteads located outside the RUD. Citing *Cramer v. Graham,* the appellants contend maintaining homesteads on residences outside the RUD district does not defeat a claim of residency. 264 S.W.2d 135, 138 (Tex.Civ. App.-San Antonio 1954, writ ref'd). In *Cramer,* several votes were challenged on a variety of grounds. Two of the voters, who were married, testified that they had resided in the district for three months before the election. *Id.* Although they had maintained a homestead designation on their former residence, it was rented to their son and his family during the period relevant to the election, and the voters testified that they visited their former residence occasionally for periods of two or three days. *Id.* Both voters testified that they had moved into the district in July and were currently residing there. *Id.* The trial court found that these two voters resided in the district, and its finding was upheld by the court of appeals because the evidence supported the findings. *Id.* In contrast, in this case, the trial court rejected each contested voter's claim that he or she resided in the RUD's district.

Although appellants rely on *Cramer,* the appellate court's reasoning supports affirming the trial court's ruling. In *Cramer,* the appellate court rejected the trial court's findings of residence with respect to five of the votes. *Id.* These five voters were employed as farm laborers in the district beginning two days before the election. *Id.* at 137. No evidence indicated that they had ever worked in the district before October 2, and they left the district on October 11. *Id.* Although each farm worker had slept in the district for nine nights, the evidence showed that the five farm workers were in the district temporarily and after the election they had returned to their homes outside the district where they lived and voted for years.

*Id.* at 138. Although the trial court found these voters to be residents of the district, the appellate court held that the voters were not residents of the district. *Id.* Thus, the *Cramer* Court relied on the temporal nature of the farm workers presence in the district in deciding to disregard the trial court's ruling to count the votes of the farm workers. The nature of the presence within the RUD of the voters casting the ballots challenged by the incumbents here appears even more transitory than that of the farm workers whose votes were disallowed in *Cramer.*

While a voter's stated intent to live inside the RUD on the day of the election is a factor for the trial court to consider in determining the question of the respective voter's residence, a voter's statement about where the voter intends to reside is not the only evidence probative on the issue of the voter's domicile. As reflected by the court's analysis in *Cramer,* evidence that a voter has designated a homestead outside the district for a tax year overlapping the election is evidentiary of a voter's intended residence. *Id.* No one factor, such as the voter's statement regarding the voter's intended residence, is dispositive on the question of a voter's intended domicile.

While most of the voters casting challenged votes checked into or visited as guests at the hotel for one or two nights before the day of the election, all of the evidence before the trial court allowed it to infer that none of the challenged voters were regular residents of the hotel either on election day or when each voter had filed their respective voter registration forms. Citing *Mills v. Bartlett,* the appellants contend that their bodily presence in the district is not required for any specific length of time to establish their residence within the district. 377 S.W.2d 636, 637 (Tex.1964). In *Mills,* the challenged can-

didate signed a binding contract to enter into the practice of law in the district in October. *Id.* Bartlett, the candidate whose right to seek office was challenged, graduated from law school, returned to the district in December, and commenced his law practice before becoming a candidate for district attorney. *Id.* at 636–37. The other candidate sought to enjoin Bartlett's inclusion in the ballot because Bartlett had not resided in the district for six months prior to the May election. *Id.* at 636. The trial court denied the requested injunction and Mills appealed. *Id.* On the date of the scheduled election, Bartlett would have been actually present and living in the district for four and one-half months. *Id.* at 637–38. The record showed that when Bartlett left the district to finish law school, he left the district temporarily and had a fixed intention to return to the district. *Id.* Because the trial court could draw inferences from the undisputed facts, the Texas Supreme Court held it was "unable to say as a matter of law that Bartlett did not become a resident in contemplation of the statute[.]" *Id.* at 368. As a result, the Texas Supreme Court upheld Bartlett's right to run in the election. *Id.*

Here, the evidence allowed the trial court to infer that the voters did not intend to be temporarily absent from the Residence Inn after the election. On the evidence before it, the trial court could reasonably conclude that each voter intended to stay at the Residence Inn temporarily, and that while at the Residence Inn, each intended his or her domicile to remain at the voter's respective home despite the voter's testimony to the contrary. The trial court, as the finder of fact, was free to choose to reject the evidence offered by the voters whose votes were challenged by the incumbents as a matter of credibility. *See City of Keller,* 168 S.W.3d at 811, 819–20.

■ Appellants advance specific arguments with respect to whether the incumbents carried their burden of proof with respect to Doyle, Cook, Robert Allison, Benjamin Allison, Jenkins, and Curry. Although no fixed period of time is required to establish residence, we must look at all of the evidence to determine whether the trial court's findings are reasonable. *Id.* With respect to Doyle and Cook, the appellants argue that the incumbents offered no evidence regarding their residences, other than voter registration forms stating their residences as being located at the Residence Inn. However, the records of the Residence Inn show that neither Doyle nor Cook registered as guests of the hotel. Furthermore, Jenkins admitted that neither Cook nor Doyle spent the night in the hotel on the night of the election. The trial court, as the finder-of-fact, could weigh this evidence against the conflicting evidence. The records of the Residence Inn did not reflect that either Cook or Doyle rented rooms there. The evidence in the record, and reasonable inferences from it, support the trial court's conclusion that Cook and Doyle were not domiciled at the Residence Inn during the periods in question. *Id.;* Tex. Elec.Code Ann. § 1.015(a). We hold the trial court did not abuse its discretion in finding by clear and convincing evidence that Cook and Doyle were not domiciled at the Residence Inn during the periods relevant to the RUD election.

■ The appellants argue that the trial court could not reasonably form a firm conviction or belief that Robert Allison did not reside in the RUD because he was not previously registered to vote elsewhere, Robert owned no real property, and he testified that he decided to move to the Residence Inn. At the time of the trial, Robert testified that he was living at the Residence Inn with his brother Benja-min. The appellants also argue that based on the evidence, the trial court could not form a firm conviction or belief that Benjamin Allison did not reside in the RUD based on Benjamin's testimony that he moved into the Residence Inn and his testimony that at the time of trial he had stayed there almost every night.

With respect to the Allison brothers, the trial court's findings of fact state that the residences of the appellants "were not within the RUD on the date each of them signed a voter's registration application, nor on May 8, 2010[,] when they voted, nor subsequently." Thus, the trial court clearly rejected the Allisons' claims that they intended to make the Residence Inn their domicile. Because the trial court rejected the appellants' claims of residence, the question on appeal is whether the trial court's credibility determinations were reasonable. *See City of Keller,* 168 S.W.3d at 819–20.

The records of the Residence Inn show that neither of the Allisons rented a room at the hotel until May 26, 2010, approximately two weeks after the incumbents challenged their votes by filing an election contest. While there was evidence that Robert and Benjamin spent either one or two nights at the Residence Inn before the contest was filed, the trial court could have reasonably viewed the temporal nature of these stays as evidence that the stays were intended as temporary and they were not intended to be permanent. Further, the trial court may have inferred that the Allison brothers' presence at the Residence Inn on May 7 and 8 during what McDuffee described as a "party" was additional evidence that the Residence Inn was not the Allison brothers' fixed place of habitation. *See* Tex. Elec.Code Ann. § 1.015(a). There was also evidence from which the trial court could infer that the Allison brothers never intended to move from

their parents' home, as both spent nights at their parents' house during relevant periods being considered. Although other fact-finders might have reached a different conclusion, the trial court could reasonably find that the evidence supporting the Allisons' claim of residence within the RUD was not credible, allowing the trial court to disregard it. *See City of Keller*, 168 S.W.3d at 811, 819–20.

The Allisons' presence at the hotel after the incumbents filed suit is also a factor the trial court could have considered in determining whether the Residence Inn was the Allisons' home and fixed place of abode at the time of the election; however, this factor is not very strong evidence of a voter's intent. The trial court could have inferred that the Allisons' post-election conduct of spending nights at the hotel was done to bolster their claim of having resided at the Residence Inn during the RUD election. Thus, the trial court could reasonably infer that the Allisons would not have lived at the Residence Inn following the election had no election contest been filed. On the evidence before it, the trial court could reasonably conclude by clear and convincing evidence that the Allisons' residence for the relevant periods under consideration remained with their parents' on D Street, a location that is not within the RUD's voting district. *Id.*

█ With respect to Jenkins and Curry, the appellants argue that the only evidence supporting the trial court's findings as to their contested votes consisted of their ownership of homes outside the RUD on which each had declared his homestead. But, the trial court could have considered that Jenkins had no long-standing arrangements at the Residence Inn, as he checked into the Residence Inn on May 7 and checked out on May 9. The trial court could also consider that Jenkins and his wife lived on P Street immediately before

the election. The trial court may have also considered the number of persons staying in the rooms as inconsistent with the notion that the living arrangements were intended as being permanent. Jenkins testified that between May 7 and May 9, three of the other contested voters slept in his hotel room. The trial court also could consider that Jenkins had not changed his address before the election, and that on May 22, after the election, Jenkins engaged in post-election conduct to bolster his claim of having changed his residence to the Residence Inn. Under the circumstances, the trial court could have viewed Jenkins post-election conduct as a tacit concession by Jenkins of the deficiencies existing in his claim of having changed his residence to the Residence Inn. *See id.* Acting as the fact-finder, the trial court could have reasonably determined by clear and convincing evidence that Jenkins domicile for the relevant period in consideration remained at his address on P Street, which is not within the RUD's voting district.

█ Before the date of the election, Curry spent the night of May 7 at the Residence Inn, and he possibly stayed there on May 8 as well. Curry paid for at least one of the nights that he stayed in his room. He brought personal articles that are typical for a temporary stay, and his homestead exemption is on property located at A Street, which is outside the RUD's voting district. Curry's car is registered at the A Street address. His checking account and library card carry an A Street address. Other than the items he brought to the Residence Inn, his possessions all remained at the house he owned on A Street. Curry testified that after the lawsuit was filed, he and his wife spent a dozen nights or more at the Residence Inn. The trial court, acting as the finder-of-fact, could reasonably give little weight to Curry's decision to spend nights at the Residence Inn after the date the incum-

bents filed the election contest. The court could also consider Curry's conduct in voting in other elections around the same time as inconsistent with his claim that he resided at the Residence Inn. On the evidence before it, the trial court could reasonably conclude, by clear and convincing evidence, that Curry's residence for the relevant periods under consideration remained at his home on A Street, a location that is not within the RUD's voting district. *Id.*

We are not the trier of fact in this case. The standard of appellate review requires that we disregard "all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.,* 96 S.W.3d at 266. Although the voters casting the contested votes each testified to having the intent to establish residence in the RUD, and there was evidence that each of the appellants was physically present at the Residence Inn on the day of the election, the trial court could reasonably believe that their actions were consistent with its conclusion that each intended his respective stays at the Residence Inn to be temporary. *See Cramer,* 264 S.W.2d at 138.

Likewise, the record contains sufficient evidence to support the trial court's findings concerning the respective residences of all of the voters who had cast a contested vote. Based upon the application of the standards of appellate review, we conclude that the trial court did not act unreasonably in reaching its conclusion that the votes cast by the voters casting a vote challenged by the incumbents had cast a vote that was not legally countable. Tex. Elec.Code Ann. § 11.005. The Election Code authorized the trial court to then subtract the uncountable ballots from the election totals. Tex. Elec.Code Ann. § 221.011. Because the evidence is sufficient to support the trial court's findings, we overrule issues one through seven.

## Sanctions

Appellees request that sanctions be imposed for the appellants' filing of a frivolous appeal. *See* Tex.R.App. P. 45. Appellees suggest that the appellants provided false information on their voter registration forms as part of a "scheme to take over a governmental entity" and then on appeal failed to present the evidence in the light most favorable to the judgment.

The standard of review requires this ·Court to defer to the trial court on factual matters. *City of Keller,* 168 S.W.3d at 819. That deference compels the result we reach in this appeal. Given that the parties utilized the trial court to resolve an issue of disputed fact, and that appellants have a right to our review to determine whether the trial court properly exercised its discretion in resolving the issues, we decline the appellees' request for sanctions.

We affirm the trial court's judgment.

AFFIRMED.